We'll hear argument this morning in Case 12-1038, United States v. Apel. Mr. Horwich. Thank you, Mr. Chief Justice, and may it please the Court. Section 1382 makes it a misdemeanor for a person to reenter a military base after having been ordered not to do so by the commanding officer. Now, the Ninth Circuit here added another requirement for conviction, which is that the defendant must be found in a place that, as a matter of real property law, is within the exclusive possession of the United States. That requirement isn't anywhere in the text of the statute. No court has ever given an explanation of where it comes from, and Respondent no longer defends that requirement. But it is in the Air Force Manual, and in a JAG opinion, was the exclusive possession criterion. Well, I think I would say a couple of things about those sources, Justice Ginsburg. First of all, they reflect essentially conservative legal advice that recognizes that some courts had made a reference to such a requirement. And so the responsible thing to do, if you're in a JAG rendering an opinion on what the right way to structure a lease is or whether a particular place is, in fact, covered by 1382, is to confirm that, yes, this would meet the criteria that the courts have established. But that doesn't – certainly doesn't make it binding on this Court, and other courts have held to the contrary. Of course, it doesn't. Since this case has been pending quite a while, has the manual changed, has – to delete the exclusive possession? If Your Honor is referring to the U.S. Attorney's Manual, no, it hasn't been altered. Although, I would say that the very first section of the U.S. Attorney's Manual makes clear that it doesn't – it's not intended to create rights, it's not intended to bind the Department of Justice or otherwise modify the meanings of criminal statutes. It's simply a reference guide, and it is a reference guide that certainly would be accurate in some circuits. We think incorrect, and that's what – of course, this Court is now in a position to resolve the disagreement between the courts on that – on that subject. So what Respondent does argue, because, of course, Respondent isn't even defending that requirement here, is – is that – and what the case then comes down to, I guess, is that Vandenberg Air Force Base is not a military installation. Now, we think it is, and we think all of it is. And the reason for that is that the statute refers comprehensively to a long list of places, reservation, fort, post, arsenal, yard, station, installation, that covers the range of places that are subject to military command. And Vandenberg is, of course, a place that's subject to military command. And in particular – Kagan. How do we tell that, Mr. Horwich? What's the test for determining when a place is subject to military command? Military command is a question of lawful authority, what might be thought of as a civilian context as the extent of the commanding officer's jurisdiction. And so what – the way things are set up is that the civilian leadership in the Department of Defense defines bases, and then the military commanders who are appointed by the President then, through appointing subordinate commands, will have units assigned to particular bases, and the commanding officer of the unit will be the commanding officer of the base to which the unit is assigned. Well, some military installations are located in very rural areas. Now, suppose you have an installation in such a place and there are buildings and facilities that you can see in one part of this territory, but there's a lot of open – there are a lot of open fields around it. And suppose it's not posted. Would that still be a military installation if somebody goes on that? It would, although let me say a few things about that. Your description actually is pretty apt as to Vandenberg itself. It's in a rural area. There are large areas of what you, I think, accurately describe as kind of open fields that are there precisely to serve as a kind of a buffer zone around these enormous rocket launches, and some parts of it are particularly posted, other parts aren't. We do think that there would – that a defendant needs to be put on notice in some respect. We refer to it, I think, inartfully in our brief is actually that the defendant would have knowledge. I think it's more the defendant needs to be on notice. And like ascertaining the extent of any geographic place, the place to look for starters is a map. I mean, if you look at a – if you go – nowadays you go on the Internet, you pull up any map, it will show you an area marked off as Vandenberg Air Force Base. But a map presumably reflects who owns the property, and you yourself say that that's not what's significant. And I took your point in your brief to suggest some kind of more functional test, is this property being used for military purposes. Am I – am I wrong in ascribing that to you? Yes, yes. We don't – we're not suggesting a functional test. What we're suggesting is that the coverage of 1382 should be coextensive with the commander's authority, which is essentially, as I sort of suggested, the nature of a jurisdictional test. Where does the commander's regulatory and barman authority extend to as a matter of military law, which should be backed up by the misdemeanor sanction in 1382. And so that's why I'm not sure that I can – that I follow that completely. When I look at the list of items mentioned in the statute, reservation, host, fort, arsenal, yard, station, or installation, I don't think of command separate from operational control or being run by and used by the military. Each of those terms has an operational quality to it that mere ownership, which I equate with command, doesn't. It makes no sense in answer to Justice Alito's question to say you need notice unless that facility has a military flavor to it that someone could know about. In – you talk about this particular camp, but you've got a whole green line around it to tell people which sections you are actually considering the camp, and he was found outside of that green area. You've got a public school, a public highway. I'm not quite sure how you can keep a person off of lands that the military is not using in its operations. Well, I guess just to take the last point there, I would disagree with the premise that the military is not using these lands in their operations. I mean, to take one example, there will be – there's a launch tomorrow at Vandenberg, and the other highway that's kind of indistinguishable from Highway 1 for these purposes is going to be closed down because it's in the area that's dangerous, because it's in the potential impact zone of the Rockies. Well, you close down roads for parades, you close down areas for other public needs. Certainly. But I would be clear that the reason that is being closed down is because the commanding officer at Vandenberg has determined that that property, which is owned by the United States, is placed under his authority as a commanding officer, is assigned to the Department of the Air Force for administration. He has determined that his military needs require closing that part on that day. And that's confirmed in the terms of the easement. If you look at the easement between the U.S. and the counties of the County of Santa Barbara, the – it makes it very clear that the military commander has authority to exercise control over the easement property. Precisely so, Justice Kennedy. And I think that gets to the bigger-picture point here, which is that it would be a very odd result to say that a military commander has to maximally inconvenience the public by shutting a place down at all times in order to preserve the misdemeanor sanction that backs up his authority. If your position is right, then I think there would be nothing left of Flowers, because Flowers, the government, owned that area as well. Is there anything left? In this case, the property is used as a public highway, and people go back and forth. In Flowers, it was a street. So are you urging that Flowers is essentially overruled? No, not at all, Justice Ginsburg. In fact, I think Flowers is supportive of our position here on the statutory point, precisely because the Court thought to resolve Flowers on the constitutional grounds, and there was no question there that it was covered by 1382, notwithstanding the fact that it is that it could be described as a public street. It was also property that was under the command of the commanding officer at Fort Sam Houston in that case. And so the Court went to the constitutional question. I'm happy to talk here if the Court's interested about the constitutional differences between this case and Flowers. But Flowers does strongly imply that coverage of 1382, which the Court would ordinarily address first before reaching the constitutional question, wasn't in doubt there, nor was it in doubt in any of the cases that this Court has decided under 1382, each of which has involved a military installation that is to some greater or lesser extent in some places or other open to the public. So it's not that the Respondent in this case didn't want to protest that. He just wanted to take a drive up to Santa Barbara, or I don't know, maybe it's not illegal to walk in Southern California. Maybe he wanted to walk along the Pacific Coast Highway. Would he commit a misdemeanor by doing that? So his — the terms of his Barment Order and the ordinary terms on which Barment Orders are issued at Vandenberg is that there's an exception carved out for him to traverse along the easement, which, again, is in the nature of a concession to public convenience, which it seems quite unfair to sort of say that, well, the military has wound up worse off by trying to accommodate its — trying to accommodate itself to the extent consistent with its security needs to public use and convenience. Ginsburg. Where is the exception? Is it in the Bar Order? Yes. It's on page 64 of the Joint Appendix, and it's in the middle of paragraph 2 on 64. It says, Effective immediately, you are ordered not to enter on to Vandenberg Air Force Base except to traverse, meaning to travel to or from Lompoc and Santa Maria on Highway 1, and to from Lompoc and Amtrak's surf station on Highway 246, which passes through Vandenberg's property. He couldn't go to the public school, though, or the stores or any other facilities that the public's invited to. That's correct. But, of course, there's a reason for that, which is that he has been individually identified as posing a threat to the order and security of the base. I mean, I would point out, he was barred. Sotomayor, it seems to be an odd thing for a Class B misdemeanor to be used to protect the national security. Well, Congress has determined that the threat is so great that the only thing you need is a Class B misdemeanor to protect the U.S. Well, it's certainly not the only thing. In our opening brief, we have a footnote that runs through kind of the hierarchy of sanctions that might be applied. There are some pretty severe ones. There are some severe ones. So we think of this as being sort of a first line of defense, if you will. Are there no sanctions for trespassing upon Federal property that is not a military base? No, Justice Scalia, absolutely there are. There's a statute like that for the National Park Service. There's a statute like that for the Bureau of Land Management. There's a statute like that for the Forest Service. Do you think, Mr. Horwitz, that there's any point at which a military installation can lose its character as such? I mean, I'll give you an example. Suppose, you know, that in this base area, the government, the military decided to allow four private condo buildings and six restaurants and three movie theaters, and it really just turned into a regular old town. And it entered into agreements whereby all the policing was being done by local law enforcement officers rather than by the military. Is there any point at which it just becomes too much not like a military base, where you lose the ability to do this even though it's under the formal command of a military officer? I think if it's still under the formal command of the military officer, and the military officer is empowered to issue regulations and issue barments, which this Court has long recognized is the necessary concomitant of the functioning of a military installation, then, no, it continues to be. I assume it would be contrary to his orders to permit such installations without his ability to control them, including by issuing the barment orders. He has no authority to do that, does he? No, that's exactly right. So, for example, to Justice Kagan's hypothetical, and Justice Sotomayor, you referred to the school that is on the base. There are a couple, actually a couple, schools on the base. One of them is leased to a school district, but it is nonetheless still subject to the commander's command authority. The commander does respond to dangerous weapons or drugs being brought there, and that's necessary. It's right. So what happens, for example, at the school, if there's an assault on school premises? Who deals with it? In the school premises, I believe, I don't want to be quite certain about this, but I believe that the — well, certainly the elementary school, and I believe also the middle school, is within the area that is — within the exclusive legislative jurisdiction of the United States. It's been ceded to the United States. So the proper response there would need to be by Federal law enforcement. Crimes would be prosecuted under the Assimilative Crimes Act. Kagan. I'm sorry. Is that military police or is that — No. Who comes and — is it members of the military or is it members of the county police force or is it — No. If we're talking about an area that's under the exclusive Federal jurisdiction, the military — the military police or security forces, as they're now called, are not empowered to make arrests in that formal sense. They can — they can detain so that law enforcement officers who are empowered to make arrests can then respond. So, for example, if you have — I mean, the more common thing is a traffic stop, maybe, on one of the roads off the highway or something like that. They will need to detain and wait for an appropriate law enforcement official to respond. So, again, there is somewhat of a different situation obtains on the highway, because there is authority for the county police, the county sheriff, for example, to respond. So there's a different status there. But that's — Well, I guess I'm just wondering with respect to each of these places, I mean, the Who's actually in control when something goes wrong in these places? Well, let me bracket off the Amtrak station, because we don't think the Amtrak station is under military command, and I'll — I can explain why. In the other places, it's often the case that the first response will be by the security forces, because they are in the area and they will be patrolling. The security forces meaning the military? The military. So do military personnel actively patrol this entire area? Yes. Yes. The Amtrak station, I should say, though, is different, because there the station and the tracks that actually run to and from the station are actually on a narrow strip of land that is owned in fee by a railroad. It is not owned by the United States. It's not under Air Force Department administration. It's not part of the military commander's command authority there. So that part is not covered. So in the situation of, you know, somebody asks, well, can somebody go to the train station and take a train if they've been barred? Well, yes, they're allowed to travel on the highway that goes there, and they're allowed to wait at the train station and go. And that arrangement obviously has been determined by the appropriate officials to be sufficient to protect the military's interests. If it weren't, I imagine we would see a different arrangement, but the accommodations have been made. I think the larger point here, though, is that if the commanding officer has the authority to issue these regulations and has the authority to issue these barments, it seems across the whole area, which I think is not really subject to dispute here, the command that, as Justice Kennedy points out, the easement says he can regulate the use of the highway. If he has that authority, why is the sanction there? Ginsburg That Apple can't use the highway, that dispensation was a matter of grace? Yes. Ginsburg Is that what you're saying? Yes, it would be, in the same way that the commanding officer can determine that any particular use of the highway is inconsistent with the military's needs. That's why the reservation is in there, precisely to reserve, as Justice Scalia suggests, the appropriate authority to the commander to do what he needs to do to run the installation. Kennedy I suppose if the commander thought it was necessary, he could stop trucks with flammable materials from coming through at the time when the launch is being prepared and so forth. Ginsburg Precisely so. And if he — and the odd result here under Respondent's reading, because, of course, Respondent's reading turns on the coverage of what military installation means, and that covers the first paragraph of Section 1382 as well, which deals with enforcing regulations. The oddity of his reading is that if a truck then did drive on the highway, bringing the flammable materials, the truck would be in violation of the regulation, but it's sort of the sound of one hand clapping, because it wouldn't actually be a misdemeanor because the statute wouldn't cover that part of the commander's command area. That — that incongruity is very strange. We wouldn't say, say, in the national parks context, if the Park Service has a rule that says you can't feed the grizzly bears, it means you can't feed the grizzly bears anywhere in the park. It doesn't mean, yes, you're not supposed to, but it won't be a misdemeanor if you feed them on the road, but you can't feed them off the road, and it is a misdemeanor. That's essentially the regime that Respondent suggests this statute set up under. Alito, can I ask you this, which is — this question is stimulated by what Justice Kagan asked. Is it — my understanding is that if you look at many military reservations, you may need a very detailed map to figure out — and a crime is committed someplace on there, or other Federal lands. You may need a very detailed map to determine whether criminal jurisdiction over that particular offense is exclusively Federal or Federal and concurrent. Now, and I would assume that that could be true of a military base that is completely sealed off to the public. That's — I could perhaps agree with you, yes. Alito, do you understand that the Ninth Circuit's holding to be based on access or to be based on jurisdiction over crimes that are committed there? No. I understand it to be based on neither of those things. I understand it to be based on a real property analysis, which says at this point where Respondent was found, there is an easement. So there is a real property interest that is held by someone other than the United States, therefore the United States does not exclusively possess it. But that's not Respondent's theory here. No, it's not Respondent's theory here. But if I might just say one word about the absurdities, the kind of absurdities that the Ninth Circuit's position seems like it might lead to is that it doesn't seem like it's limited to easements. I mean, Respondent, of course, as we know, wasn't using the easement for its purpose. So it's just sort of a coincidence he's also on the easement. And so on the Ninth Circuit's approach, maybe there's a utility easement or maybe there's a subsurface mineral rights that have with them an entry and egress rights or something. And I guess that also would defeat on the Ninth Circuit's approach the application of 1382, which seems very strange. Well, there may be — suppose property is leased to the — I don't know whether this actually ever occurs, but suppose it's leased to the United States and used for a military reservation. Would there be exclusively Federal criminal jurisdiction there? Would there not be concurrent jurisdiction? Well, the way that — that's a matter that is decided under the enclaves clause of the Constitution, says that the State has to cede to the United States that jurisdiction. So the State has ceded to the United States that jurisdiction over the base. The United States, I believe it's correct, the United States retroceded that jurisdiction back to the State as to the highways, so that highway patrol officers could — could go along those — could go along the highways. But that's really a separate issue from what's presented here, because that would control the application of the Assimilative Crimes Act, for example. But this statute — this statute is not — this statute is a freestanding Federal statute. And I would say in the example that you give, I think — I think this is — it's a little bit more of a moment about the situation where the United States leases property and — and places it under military jurisdiction and gives it to a military command. There certainly are such places. And that's why an ownership test isn't quite right. I think an ownership test, Justice Kagan, is sort of right about 95 percent of the time, because it's usually true that the United States is going to want to own the places that it puts under military command. But it's not perfect in the leasing context. It's also — it's also problematic in the situation that comes up in some of the courts of appeals cases regarding Coast Guard or naval security zones, which are designated waters adjacent to a base that are appurtenant to the commander's authority over the base. And those aren't kind of owned in — in exactly the same way, but they're nonetheless under military command, and the courts of appeals had no difficulty seeing that they're covered. Kagan. I had thought that in your brief you thought that the ownership test was both under inclusive and over-inclusive. Yes, I think that's correct, too, because there's certainly property that the United States owns, plenty of — most property the United States owns isn't under military command. And so it's not just Federal ownership. It's — although I would — I would point out that with respect to these other statutes that deal with other agencies of the government that — that administer lands, it is generally true — I can't say that it's exclusively — it's true across the board, but it's generally true that there's a statute, something like this one, that corresponds to the regulatory authority of a land management agency. So — and again, we wouldn't punch holes in the misdemeanor sanctions that back up those other land management agencies' authorities, so I don't see why we would punch holes in this statute either. Could I just ask you what we should make of this — what we should make of this green line? Yeah. What is the significance of the green line? The — speaking outside the record, it seems like it was probably drawn to guide road crews in the parts of the road they should be resurfacing, because one of the terms of the easements is that California is responsible for maintaining the road. And so, you know, when the California Department of Transportation road crew comes out to repave it or something, they need to know, well, how wide, how far are we supposed to go? So there's — there's this green line. There's some other green lines scattered on other places of the base in various shades of being worn down. But they're — I think they can be taken to demarcate the extent of the easement. So — so on the Ninth Circuit's approach, the green line is significant for that reason, because it tells you which side is which. But I would point out that this particular place does just lie within a road that is miles inside the actual perimeter, outer perimeter, of the base. It's a couple miles as the crow flies and several miles as you travel on the road. So it's not as if it sort of lies outside of the edge. If I could reserve. Thank you, counsel. Mr. Chemerinsky. Good morning, Mr. Chief Justice, and may it please the Court. This is a case about the right to peacefully protest on a fully open public road in a designated protest zone. For decades, every lower federal court, and for that matter the United States itself, interpreted 18 United States Code section 1382 to apply only if there's exclusive federal possession. Any other interpretation would raise grave First Amendment issues. As Justice Ginsburg pointed out, this case is indistinguishable from this Court's prior holding in Flower v. United States. Flower involved a street that was on a military base. It involved an individual, John Flower, who was subjected to a bar order. But that was a First Amendment case, and the problem there was that he was barred for a peaceful protest the first time around, and that's not this case. It was not argued in that case that the statute didn't apply, and that's what you're arguing here. Your Honor, there are two arguments here. One is that 1832, 1382, does not apply because military installation requires exclusive possession. The second argument. On your Flower's point, I think Mr. Horowitz said that there was no doubt that 1382 applied. It was only a constitutional question. That's correct. Yes, Justice Ginsburg, there's no dispute in Flower that 1382 would apply because of the street within the military base. But to go to Justice Kennedy's question, this Court in Albertini was very clear that what Flower means is that when there is a fully open public road, there is a right to use it for speech activities. Well, that's a First Amendment case, but let's concentrate first on the argument you make under the statute. It seems to me that the statute should be construed according to normal rules of easements. And the owner of the subservient easement, the easement holder, cannot overburden that easement. He cannot. I've got an easement on the back of my property for the utility company. They can't hold a picnic there. They can't do that. Yes, Your Honor. It's overburdening the easement. And this is standard stuff. And it's right in the easement agreement with the City of Santa Barbara that the police — that the military commander can make reasonable regulations. Your Honor, I can't. Now, you have a First Amendment argument, I understand that, but let's just concentrate on the property ownership. Yes. In terms of the easement, when an easement goes towards a public road, that easement includes the right to use the public road for speech activities. You're right, Your Honor, that the rule paragraph of the easement. You're back on the First Amendment case. It may or may not. If the commander wants to close the base for a rocket launch, he certainly can. That's set forth in Article of Conditions, paragraph 4 of the easement. Paragraph 4 says that there can be rules and regulations with regard to the easement. But, Your Honor, those rules and regulations must be consistent with the Constitution. For example, the commander couldn't exclude African-Americans from that road. And that's why the First Amendment case. Scalia, you're going back to the First Amendment again. Scalia, which is not the issue on which we granted certiorari. We're only interested in whether the statute applies. But, Your Honor, in interpreting the statute, it must be done so as to avoid constitutional doubts. That's why the First Amendment comes up. Also, of course, as this Court repeatedly has held, Respondent can raise any issue that was raised below to defend the judgment, which is also why the First Amendment is here. But, Your Honor, I'm trying to say the same thing. Scalia, you can raise it, but we don't have to listen to it. Of course, that's right. That's what I'm saying. Okay. But you can go back to your own. Of course, Your Honor. And I will address the meaning then of military installation. Yes, Justice Breyer. The difficulty that I'm having is the Ninth Circuit said the reason that your client won is because the piece of grass between the road and the sign was a piece of grass that was not — it was subject to an easement and the government lacked the exclusive right of possession. When I saw that, I thought, well, there are thousands of different kinds of easements, as Justice Kennedy just said. They're for utilities. They're for people might want to — I mean, I can imagine a million, as you can, too. So not all of those would involve First Amendment anything. And yet the Ninth Circuit would seem to say that your client could go and demonstrate as long as the utility company had an easement. So how are we supposed to interpret the statute to avoid the First Amendment problem without getting into an interpretation that, to me, would seem ridiculous? Your Honor, the question is what does the phrase military installation mean? One way of defining it would be all of the property that's owned by the United States. But as Justice Kagan pointed out, the United States rejects that interpretation in footnote 1 of its reply brief. The alternative interpretation is exclusive possession. And that's the one that all of the lower courts in the United States say— Breyer. Why does the First Amendment allow a person to go to the heart of the military base, put on any demonstration they want, the statute doesn't apply, for the reason that once every four months, the PG&E has an easement to go out and read the meter? Your Honor, we would not take that position. We think it's okay. That's exactly. I know you wouldn't. That's why I want to know what your position is as to the interpretation of the statute that avoids my absurd PG&E result, but nonetheless does what you want, which is to protect the First Amendment interest. And I think it goes exactly to Justice Kennedy's question of the difference between an easement for a public road, an easement for your backyard, or the easement for a utility. And that's why I don't think that the First Amendment aspect of this case can be separated from the statutory aspect. This was— Sotomayor, how are you buying into the real property being the definition here at all? I mean, it seems to me that when I read the other definitions of the statute, I keep going back to that it's a function analysis and not a real property analysis. Because that would answer why this particular electrical meter reading, that area still being operated by the military for a military function. That's what forts do, reservations, yards. I don't know why we would read installation any differently. But you're buying into this real property as being the defining term. No, Your Honor, I'm not. I completely agree with what you just said. I think it is a functional analysis. Here the military has built a fence perimeter around Vandenberg. They have drawn a green line where they say that the control begins. On the other side of the green line is Highway 1 that anyone can drive down. There are no signs that indicate that you're part of the military base. And where there's a designated protest zone. They don't say control begins at the green line. To the contrary, they say they have control over the whole installation. Do you deny that, that the commanding officer has the right to control the entire installation? Your Honor, there is a big difference between the authority of the commanding officer within the closed confines of the base and outside the base. For example, civilians cannot be prosecuted for what they're doing on that public road. They're under the memorandum of understanding the California Highway Patrol applies at all. Scalia, because of the commanding officer, agreed to that, because that's the term of the easement. Yes, Your Honor, but I will go back to what Justice Sotomayor said. There is a functional difference between the public road and the designated protest zone. There may well be, but is there a difference in the authority of the commanding officer? That's what's crucial. Well, under the memorandum of understanding, the commanding officer has ceded control over that public road to the Highway Patrol. The United States wants it both ways. They want the benefits of having an easement there in the sense that the State is responsible for maintaining the road, the State is liable for any harms on the road, the State enforces crimes on the road, but they also want to claim that they have all of the control over that public road as they would within the base. They're entitled to have it both ways. It's their base. And if that's the deal, you know, take it or leave it, State. We'll give you this easement, but the terms are what we have said. What's wrong with that? But, Your Honor, they shouldn't have it both ways. Once they've created a public road, once they've created a designated protest zone, it is different functionally than the rest of the base. Well, Mr. Schiml, I'm sorry, you raised a — you mentioned the green line, and Mr. Horwich represented some facts about it outside the record. He quite properly alerted us that it was outside the record. I just want to give you a chance to respond to that. Sure. We know that the United States treats its easement as — its control as beginning within the green line area. So, for example, when Mr. Oppel crossed the green line previously, that was the place at which he was convicted for trespass. In other cases that are cited in both of our briefs, lines on the road were taken as defining the area where military jurisdiction begins. So the Sixth Circuit's McCoy case, it was a white line, and the military said, once somebody crossed the white line, that's where Section 1382 began. If your colleague is correct that the green line marked the edge of the easement, it would be entirely proper not to arrest him for violating the base until he left the easement, that is, when he crossed the green line. It has nothing to do with the commanding officer saying this is the only part of the installation that we care about. No, it's not about care. It marks the end of the easement. Well, you're absolutely right, Your Honor. The green line is taken by the United States, marking the end of the easement. And the United States, therefore, can enforce 1382 once Mr. Oppel or anybody else crosses the green line. But when it is on the public side of the green line, on that public road, in that protest area, to go back to what Justice Sotomayor said, functionally it felt very  But, Mr. Gimbinski, does that mean that the government could not have issued this barment order in the first place? No, Your Honor. We do not challenge the barment order. Well, then I'm perplexed, because if the government has sufficient commanding authority to issue the barment order, to say, notwithstanding that Mr. Oppel had not crossed the green line, that he just can't be here and he's excluded, then why don't they have sufficient authority to prevent him from reentering? In both of the instances that led to barment orders, he crossed that green line, was on the military base side. And if he does that, then 1382 applies. I think so, Your Honor. But the barment order that Mr. Horwitz just read to us says that he can use the road, but that's not because the road is outside the statute. That's because the government, as a matter of grace, said right in the order, right in the bar order, you can use the road. So there's a sharp difference. The government says the road is under military control, if the commander so chooses. But we're going to let him use the road. The government treats the domain as including the road, as including this protest area. Your Honor, there is a difference between the road and the area within the green line. And so what I was saying to Justice Kagan is the reason why the barment orders were permissible is he crossed the green line. But you're saying that if he had not crossed the green line, he could not have been excluded? That's correct. And you're saying that the military cannot exclude any person from any of this area outside the green line? That's correct. 1382 only applies to that which is in the exclusive possession of the United States, which is the area in the green line. If that's a constitutional So we're back to the real estate test. I thought that you were not relying on the exclusive ownership test. You are? Our brief very much adopts the exclusive possession test, though I do believe, as Justice Sotomayor said, there is a functional reason for this. It is the difference between the public road and the area inside. So you're defending the Ninth Circuit's? We are very much defending the exclusive possession test. Oh, that's what I don't understand. Let me press at the risk of repetition. The reason I'm asking this question is the record is not developed. I looked at the Google maps. It looked to me like this area is sort of a suburban house with a lawn in front of it, and you drive along the street and you suspect that the street may belong to the city a little way up the lawn, but beyond that, it probably belongs to the homeowner. And when you try to see where does the green line cross that grassy area, you can't easily tell. And it may be just a foot or two. So it may have been inconceivable that your client didn't cross the green line. Or maybe he didn't. I don't know. So therefore, you are back to a more basic test. And you say, we agree with the Ninth Circuit that if they do not have exclusive control, the military can't enforce this statute. But what do we do, which was my question, about instances where the military does not have exclusive control, but the reason it doesn't has nothing to do with roads, nothing to do with green lines, has to do with thousands of other easements that have nothing to do with this case. Therefore, I'm pressing you to get a definition of this statute that will serve  And I think the functional approach that Justice Sotomayor suggested does exactly that. And I think here it is, the area that the United States Government has determined by where it's built the fence and drawn the green line, that it has exclusive possession. Sotomayor, Mr. Chairman, I didn't mean to interrupt your sentence, but I mean, I may own a parcel of property, and I may put up a fence around my property, and I may not put the fence right at the very edge of the property. I may leave a little border between the edge of my property and the place where the fence is. Now, are you saying that I have ceded exclusive control over this area between the fence and the end of the property? No. And, in fact, that's exactly the situation here, and it goes to the answer where Justice Breyer began a moment ago. Here what you have is a fully fenced perimeter. About 200 yards from that fence perimeter where there's a gate, a green line is drawn on the ground. And just the other side of that green line is a designated protest zone in Highway 1. And that's, of course, where these activities occurred. And what I was saying to Justice Breyer is there are reasons why every court of appeals that has considered this has adopted the exclusive possession test. It serves the interest of the public in giving clear notice for when they're on a military base. What do you mean by exclusive possession? Does the fence have any relevance? What is the relevance of the fence? The fence is tremendously relevant in determining where the government believes the military installation begins, and also it's very important in terms of national security. But there are bases that have no fences. So what there? None of that is under the exclusive possession of the government. No, Your Honor. The government gets to decide the area of exclusive possession. So take the Greer case as an example. In Greer, this case emphasized that Fort Dix, even though it was open, still was in the exclusive possession. In fact, the first paragraph of this Court's opinion in Greer says exclusive possession. Maybe the analogy that's closest to this case, then, is this Court's decision in United States v. Grace, where this Court drew a distinction between the sidewalks that run outside this building and the building itself. And the Court said as to those sidewalks, even though they abut the Supreme Court, it still is open for speech purposes. Sidewalks, public roads are inherently open for speech purposes. I'm still completely confused about the test that you're asking us to apply. Either fences are relevant or they're not relevant. If you can have exclusive governmental, exclusive military possession of a base where there are no fences, I don't really see what the significance is of the fence here. That's just for starters. Obviously, the fence is significant in terms of answering the government's concerns with regard to national security. I think the fence is also important, to go to Justice Sotomayor's point, with regard to the functional approach. My answer to your question is driverless. Scalia, what about the portion of the base on the other side of the road easement where the government does have exclusive possession? Is that okay? That's still part of the base. But what's interesting, as was pointed out, is that the government does not have exclusive possession there. There is a public school there, for example, that anyone can drive and go to. One of the consequences of the government's interpretation of 1382 is that if Mr. Oppel had a child attending that public school, he could not go pick up his child at school, though you or I or anyone else could drive and go to that public school. That may be very bad, but is it bad because the government does not have exclusive possession of every? You know, when you talk about the road, they've given an easement. So you can say, oh, yeah, they don't have exclusive possession. But the other side of the road, that vast tract, you're saying the government does or does not have exclusive? The government does not have exclusive possession. The government's going to say that. Then the word possession means nothing. You're applying solely a functional test. It only possesses that which it is using for military purposes. That's not a possession test. It's a purely functional test. But, Your Honor, Congress didn't in 1382 say all land owned by the military. It used the phrase military installation. And whenever that phrase has been defined, it always refers to the area that is reserved to be used for military purposes. The United States can draw the green line and build the fence wherever it chooses. Here it decided to do so in a particular place, leaving open a fully open public road with a designated protester. Sotomayor I'm sorry, I have the same problem that Justice Breyer has. PXs belong to the military generally, the land, but they're run by outside contractors sometimes. You're saying because they've given up exclusive control of the PX that they fail your test, so does the utility company. I don't know. It's possible that military bases generate their own utilities, but I presume that somewhere they don't, and they have an easement to drive up and read their meters. There may be easements for repairs of certain underground things that supply the base. That's not exclusive control, or possession, so what does your test mean? Sure. It is where the United States chooses to exercise exclusive possession. The United States, for example, in Greer said, we are claiming to have exclusive possession over the entire area of Fort Dix, even though there was a public road. If the government wants to say, even as to the PX within Vandenberg, that's within our exclusive possession, they can do so. But the government, by granting the easement, by allowing the public road, by creating the designated protest zone, has done something very different than exclusive possession. So that road for the public utility for which there is an easement of travel is not exclusive to the U.S.? So anybody can travel into the base at any time they want? No, Your Honor, because in order to come on to that utility easement, you would need the express permission of the base commander. So that utility easement would still be an exclusive control to go to Justice Breyer's question. You need the express permission of the base commander to drive down the road. It's just that he has given it to the public at large. Your Honor, everyone has the authority to drive down that road. Somebody who's been convicted of it. Because it's been ceded by the United States for the convenience of the traveling public. Exactly. And then the question is, once the United States has ceded the easement, under 1382, can a person be prosecuted? And once the United States has ceded that easement, does it violate the First Amendment in light of this Court's decision in Flower to prosecute a person? I thought you just answered the question from Justice Sotomayor by saying, no, no, the utility easement doesn't work because the military commander has not granted permission to anybody else to use that easement. Here we have a public road easement, and you said that's different. And my question was, no, it's not, because the military commander has given permission to use that easement. Now, I want to know what distinguishes the two cases. This goes to Justice Kennedy's question earlier. If we're talking about an easement, an easement that is created for a public road inherently has free speech rights attached to it. In fact, many lower court cases have always said an easement for a public road includes the right to use it for speech purposes. That's very different than an easement that exists for purposes of the utility. It seems to me a First Amendment argument and not an argument that goes to the scope of section 1382. No, Your Honor, because you need to interpret the statute to avoid the constitutional issues. And if you interpret the statute to allow excluding speech on this public road easement in the designated protest zone, then interpreting the statute that way would raise grave First Amendment issues. No, you're saying we should read the statute to say it only applies when it doesn't violate the First Amendment. Of course we read it that way. Of course you should read it that way. But not because it has anything to do with the scope of authority of the government. It's what the government can do. I don't know how to read that text in such a way that it will avoid all First Amendment problems. There's no way to do that. I disagree, Your Honor. I think that the reason that every lower court and the United States government itself have read military installation as exclusive possession is that otherwise it would raise First Amendment problems. Alito, you're arguing that the military cannot grant an easement across a military installation for the purpose of allowing the public to drive from a point, let's say, to the south to a point to the north without also granting an easement that would allow people to linger along the road and engage in First Amendment activity. Is that your argument? No, it is not, Your Honor. I can understand why the military might be willing to say, well, fine, we understand that it would be very inconvenient to make everybody drive around the installation. We'll allow them to drive through, but we do not want people lingering here because that does create security concerns. No, Your Honor, that's not my position. If the government wanted to have a closed base, let's say we're going to allow this road to go through, but there were signs that let everyone know they were still on the closed base, there were guards that were there, that's Greer. That's not this case and that's not Flower. Your argument, sort of a use-it-or-lose-it argument, is that correct, that, you know, the government has this commanding authority? Unless the government uses it to its full extent every day of the week, it loses it? Well, in a sense, yes, Your Honor. The sense is that the government gets to decide where to draw the green line. The government gets to decide where to put the fence. And when they've decided to create a public road with a protest zone outside of it, then to interpret 1382 to apply, as I said to Justice Scalia, a closed base. One of the arguments that the government makes is, look, what the military wants to do here is something very sensible. It keeps tight what it needs to keep tight, but it allows to be more open areas that can – that it doesn't have an interest in securing entirely. And that's for the convenience of military personnel. It's for the convenience of other people who live around the base. What's wrong with that? Your Honor, what's wrong with that is there's no need to exclude peaceful protesters from the public road and the protest zone in order to achieve the national security interests of the government. Well, that's usually the sort of determination that's left to the military commander. I can think of a lot of reasons why the commander would not want a gathering of people on the road, but would be willing to let people drive through the road. That's exactly right, Your Honor, and the military commander gets to decide that. But by creating a designated protest zone outside of that, it's indicative that the military commander doesn't perceive any national security threat from allowing a gathering there. Well, it indicates, as the Barment order does, that he does see some kind of threat by allowing somebody in there who's vandalized the base in the past. Your Honor, but we've – this Court has never said there's a permanent forfeiture of First Amendment rights because somebody misbehaved at one time. Can there be a temporary forfeiture of First Amendment rights? Of course there can be. People can be imprisoned and lose their First Amendment rights. There can be restraining orders if they're not. I'm talking about what this case is about, which is the temporary exclusion. Would your case be the same if Mr. Appell was barred for one year? Well, he can be barred from coming onto the base as drawn by the green line for one year of travel. No, he can traverse it. He can traverse. There's no question of that. Could he be barred from participating in protests for a year? Because he vandalized the base. Yes, Your Honor, a sentence could include that. There's no doubt that there could be. Or if somebody was perceived to be a perjurer. Now, here, as I understand it, he was barred permanently subject to the right of him to apply for removal of the barment. That's correct, Your Honor. There is the ability to appeal a bar order to the commander. More than that, it says, I mean, you know, if you wanted to take someone to school, it said, first, if you need medical treatment, you can just go in. And then it said, you have to receive prior written approval from me, the commander, or my designee. But if you get it, so I suppose if he had a child at the school, he would ask and they'd give it to him. I mean, it didn't seem to me an absolute bar. It seemed to me a bar for purposes of going to that particular place. He can ask the commander of the base who issued the bar order for permission  Your Honor, it's a question of whether he's allowed to use it. Do we have to get into any of that? Do we do it? Just like I don't know where he really was physically, I don't know whether that grass strip is within something, without something, these all sound like First Amendment relevant matters. But they're also relevant to the statute. They're relevant to interpret the statute, to avoid constitutional doubts. They're relevant because To avoid, just to interrupt, sorry, to avoid grave constitutional doubts. Yes, Your Honor. And, Your Honor, also, since every other court has interpreted the statute as we're talking about the rule of lenity, which under the rule of lenity means it has to be construed in favor of a criminal defendant, like so many cases that come before you, this one is about where do you draw the line. Here the government has drawn the line, and it's a green line. Now, this side of the green line, there is a First Amendment right to speak. I'm sorry, the rule of lenity, you said in favor of a criminal defendant. Yes, Your Honor. We're talking about barment here. Is that a criminal sanction? 1382 is the criminal statute that he was convicted of violating. Right. You're not allowed to collaterally attack the barment decision. No, Your Honor. What we're saying is you have to interpret the words military installation. There are two different interpretations, or perhaps more has come out. What we're saying is you have to choose the interpretation that favors the criminal defendant. So we are using the rule of lenity relative to interpreting the statute. And that's why we believe that both in terms of the statute and in terms of the First Amendment, the Ninth Circuit should be affirmed. Thank you. Roberts. Thank you, counsel. Mr. Horwich, five minutes remaining. Horwich. Thank you. Just a couple of points. I think the colloquy with my friend sort of shows that taking this functional approach to where the statute applies, day-to-day, place-to-place, is really just not going to prove workable. I mean, we have to remember this is a misdemeanor prosecution. This is not something that should entail an extremely extensive, subtle inquiry that's going to vary from place to place. And so I think that shows the wisdom of what this Court said in the Benson case, which we quoted page 15 and 16 of our reply brief, which explains, says that when a tract has been legally reserved for military purposes, courts follow the action of the political department of the government and will not inquire what the actual use is to which any portion of the reserve is temporarily put. As for the Ninth Circuit's approach, which is this sort of real estate-based analysis, I think there have been a number of hypotheticals offered that show why that's going to produce some borderline absurd or entirely absurd results. And so that's why we come back to, again, respecting the decision to place a — to a military command, and that Section 1382 provides the sanction to enforce the orders entered pursuant to that lawful command. I might say one word about the green line and its relevance. My friend says that it is sort of the threshold across which 1382 applies or doesn't apply. The relevance in a 1382 prosecution of the green line comes in a prosecution under the first paragraph for violating a regulation. At Joint Appendix 51, there's the commander's order closing the base. And what it says is, pursuant to my authority, Vandenberg Air Force Base is a closed base. General rule covering the entire command authority. Paragraph 2, the roadway easements through Vandenberg have limited use as provided, et cetera, et cetera. Use and occupation is for these purposes only and is subject to any rules and regulations the installation commander may prescribe and so forth. So what the green line is, is it's defining the boundary between the closed base, the generally closed base, and the road, which is open. And so that's what ensures that someone who's driving on the road is not committing an offense against the commander's regulations if they're just an ordinary member of the public. And, of course, if they cross over the line, then they are violating the closed base regulation if they don't have the commander's permission to cross that line. So the — what's different, of course, about Respondent is that he's been barred from the base. So the rules that apply to the general public don't apply to him. And, of course, that's the very purpose of the second paragraph of Section 1382, is to recognize that commanders can make individualized determinations, that the rules that work generally for the public don't work for particular people who show themselves to be willing to vandalize government property or disobey the instructions to remain within the areas that they may lawfully be present in. That, of course, is the basis for why Respondent was barred. Kagan. May I just ask a background question, Mr. Horwich? What's the history of this First Amendment area? When did this speech area come into being? There's — there was a settlement of litigation with the commander in the late 1980s. It's in the — it's reproduced in the — part of it's reproduced in the joint appendix, which I guess shows a couple of things, in which the commander agreed that there would be a place on the base where — Was the litigation essentially like this one, basically saying that this was not under military command? To be honest, I'm not familiar with the particular legal contentions there. But I think what the settlement does show is that if it's the commander who's authorizing this, the commander remains in charge of this. And, of course, the current protest policy, which is reproduced in the joint appendix, is quite clear that the commander retains authority to kind of control the time and place of the protests, and, of course, makes clear that people who are barred can't come back. And so on that point, with respect to the constitutional avoidance argument, I think, as the Chief Justice pointed out, it needs to be a serious constitutional doubt. And I think what this Court has said in Virginia against Hicks puts any of those doubts to rest. The Court said in that — in that case that the First Amendment permits, quote, the punishment of a person who has, pursuant to lawful regulation, been banned from a public park, so I think a fortiori, a military base, after vandalizing it, and who ignores that ban in order to take part in a political demonstration. The Court has — so the Court, I think, has already settled this. Thank you. Roberts. Thank you, counsel. The case is submitted.